UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARCUS MIDDLEBROOK,

        Petitioner,                                Hon. Paul L. Maloney

v.                                           Case No. 1:07-CV-1242

CINDI CURTIN,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Middlebrook's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Middlebrook's petition be **denied**.


## BACKGROUND

        As a result of events that occurred on or about May 3, 2003, Petitioner was charged with (1) assault with the intent to commit murder; (2) possession of a firearm during the commission of a felony; and (3) unlawful driving away of a motor vehicle. (Trial Transcript, April 19, 2004, 12-13). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Nicole Bell**

As of May 3, 2003, Bell had known Petitioner for "about four to five months." (Trial Transcript, April 20, 2004, 42). The pair "had a sexual relationship" and Petitioner would often "hang out" at Bell's apartment. (Tr. 42-44). Petitioner also supplied Bell with marijuana. (Tr. 43).

On the evening of May 3, 2003, Bell drove to Petitioner's apartment. (Tr. 15-19). Upon her arrival, Petitioner entered Bell's car and they proceeded to the residence of one of Petitioner's friends. (Tr. 19-20). Upon arriving at this location, Bell parked her vehicle. (Tr. 20-22). Petitioner did not exit the vehicle, however, but instead shot Bell in the face. (Tr. 22-23). Petitioner then "pulled [Bell] out of the car." (Tr. 24-25). Petitioner instructed Bell "to go towards the [Grand River] and get in the river" and "walk into the river and just keep walking." (Tr. 25-26).

Bell complied with Petitioner's instructions. (Tr. 27). As she was "walking down the slope" toward the river, Petitioner kicked her in the back. (Tr. 27-28). Petitioner then began to kick Bell in the head. (Tr. 28-29). When Bell reached the river, she entered and "just walked into the river until [she] got about halfway across." (Tr. 30). Petitioner, in a "very angry" tone, instructed Bell to "keep walking." (Tr. 30-31). When Bell reached the halfway point in the river, Petitioner "was standing [on the shore] with his arm out like he was going to shoot [her] again." (Tr. 31-32). Fearing that she would be shot again, Bell "knelt down" into the water. (Tr. 31-32). Bell then observed Petitioner walk away, after which she heard him depart in her car, a white Dodge Neon. (Tr. 17, 32-33, 82). Approximately ten minutes later, Bell exited the river and called 911. (Tr. 33-37).

**Dr. David Kam**

On the evening of May 3, 2003, Dr. Kam was working as a trauma surgeon at Sparrow Hospital. (Trial Transcript, April 20, 2004, 58-59). Dr. Kam treated Nicole Bell when she arrived at the hospital. (Tr. 63). Upon arrival at the hospital, Bell was bleeding "vigorously" from her mouth. (Tr. 63-64). Dr. Kam intubated Bell and acted to control her bleeding, after which she was taken to the operating room. (Tr. 63-65). Dr. Kam surgically removed several bullet fragments from the back of Bell's throat. (Tr. 66). These fragments were located "within one to one-and-a-half or two centimeters" from Bell's carotid arteries. (Tr. 66-68). The doctor testified that if Bell's carotid arteries had been struck it was unlikely that she would have survived. (Tr. 68-69). Dr. Kam indicated that the "blast effect" from the gun "can cause an injury to the carotid artery. . .because of the concussion and percussion. . .causing thrombosis, which means clotting of the artery leading to the brain." (Tr. 68-69). The doctor further indicated that Bell could have died from hypothermia. (Tr. 69-70).

**Jamie Paulk**

As of May 3, 2003, Paulk was Nicole Bell's roommate. (Trial Transcript, April 20, 2004, 80). Paulk had known Petitioner for approximately five months. (Tr. 81). Petitioner had visited their apartment previously. (Tr. 81). On the evening of May 3, 2003, Paulk spoke with Petitioner. (Tr. 81). Petitioner asked Paulk what she and Bell were doing that night. (Tr. 81). Following this conversation, Bell left to pick up Petitioner. (Tr. 81-82).

**Kelvin McCray**

In the early morning hours of May 4, 2003, Petitioner went to McCray's residence. (Trial Transcript, April 20, 2004, 89). Petitioner told McCray that "he had got into some type of confrontation out in East Lansing" and needed McCray to "take him somewhere." (Tr. 89-90). Petitioner also told McCray that he needed to change clothes. (Tr. 91-92). McCray was unable to leave his residence, but he gave Petitioner some clothes. (Tr. 91-92). Petitioner changed clothes and then departed. (Tr. 92).

In June 2003, McCray and Petitioner were both housed in the Ingham County Jail. (Tr. 93-94, 109). McCray was jailed for a brief period for failure to pay parking tickets. (Tr. 94). During this time, Petitioner approached McCray with a proposition. (Tr. 94-96). Petitioner offered McCray "like a thousand or two thousand dollars" if he would, after being released, "contact [Petitioner's] attorney to tell his attorney [McCray] picked [Petitioner] up at a certain time back in May at a particular time at a store called Terranova." (Tr. 96). Petitioner told McCray that "he was willing to pay [him] a thousand to two thousand dollars to call his attorney because he really needed to be placed somewhere at some particular time." (Tr. 96-97). McCray informed Petitioner that he could not accept his offer. (Tr. 97-98).

Petitioner later told McCray that he had shot somebody by "mistake." (Tr. 99). Petitioner indicated that the person he shot "owed him some money for some weed" and that he was simply attempting to "scare [her] and the gun went off." (Tr. 99-100). Petitioner told McCray that after shooting this person "he kicked her in the river and he said he just told her to get out the car and she walked down to the river." (Tr. 100). Petitioner stated that he was "shocked" when he learned that Bell survived the shooting. (Tr. 100).

Petitioner later passed a note to McCray that read, in part, as follows:

What I need you to do is tell my lawyer that you know for a fact that you seen me over my cousin's apartment on May 3rd, '03. You can say that we was talking about anything. The address is Apartment 1, 7337 Water Edge on Canal Road by Saginaw out by the mall, and I had - I had on all blue on that night. The time eleven o'clock. This may help me - this may help me. I go upstairs today. And don't say nothing about a gun

(Tr. 101-07).

Petitioner later passed another note to McCray which read, in part, as follows:

It happened May 3rd, '03 at 11p.m.. All you got to say that you called my cell phone at 12:00 a.m. Someone wanted some marijuana and you met me at Terranova's store and I had on all blue.

(Tr. 107).


**Mandy Bruner**

As of May 3, 2003, Bruner was employed by the Lansing Police Department. (Trial Transcript, April 20, 2004, 135). Late that evening, Bruner was dispatched to assist a woman who reported that she had been shot. (Tr. 135). When Bruner arrived at the location, she encountered a young woman who was "covered in blood" with "a lot of blood coming from her mouth." (Tr. 136). The woman was also "wet" and "muddy." (Tr. 136). The woman reported that her "friend," Marcus Middlebrook, shot her and took her vehicle. (Tr. 137-38).


**Brent Erk**

As of May 3, 2003, Erk was employed by the Lansing Police Department. (Trial Transcript, April 22, 2004, 5). Late that evening, Erk was dispatched to investigate a shooting. (Tr.

5).  When he arrived at the location, Officer Bruner and two other officers were present.  (Tr. 5-6).

Erk spoke with the victim, a woman named Nicole, who reported that she had been shot by Marcus

Middlebrook.  (Tr. 6-9).

**Brian Smitherman**

As of May 2003, Smitherman was employed as a detective for the Lansing Police

Department.  (Trial Transcript, April 22, 2004, 17-18).  Petitioner was arrested approximately one

week after Nicole Bell's shooting, at which point Detective Smitherman seized Petitioner's shoes.

(Tr. 18-20).  Swabs were also taken of the inside of Petitioner's mouth.  (Tr. 21-22).  Detective

Smitherman then delivered the shoes and swabs directly to the Michigan State Police crime lab for

forensic examination.  (Tr. 20-22).

**Michael Lam**

As of May 4, 2003, Lam was employed as an officer with the Lansing Police

Department.  (Trial Transcript, April 22, 2004, 34).  On that date, Officer Lam recovered Nicole

Bell's vehicle from a Rite-Aid parking lot.  (Tr. 34-36, 39-40).  An examination of the driver's side

exterior of the vehicle revealed the presence of "blood splatters."  (Tr. 37-39).

**Teresa Angers**

As of May 3, 2003, Angers was employed by the Lansing Police Department.  (Trial

Transcript, April 22, 2004, 41).  Late that evening, Angers was dispatched to investigate a shooting.

(Tr. 41-42).  When she arrived at the scene, Angers encountered Nicole Bell, who was "all wet" and

"bleeding profusely from the mouth."  (Tr. 42-43).  Bell indicated that she had been shot in the mouth and then pointed towards the river.  (Tr. 42-44).  An investigation revealed the presence of footprints and blood splatter marks that lead from Bell's location back to the river.  (Tr. 45-48).

**James Cherry, Jr.**

As of May 3, 2003, Cherry was employed as a firefighter-paramedic for the City of Lansing Fire Department.  (Trial Transcript, April 22, 2004, 56-57).  Late that night, Cherry was dispatched to treat Nicole Bell and transport her to a hospital.  (Tr. 57-62).

**Marijo Crow**

As of May 4, 2003, Crow was employed as an operating room nurse at Sparrow Hospital.  (Trial Transcript, April 22, 2004, 64).  Early that morning, Crow assisted in the surgery to treat Nicole Bell.  (Tr. 65-67).  Crow was given the bullet fragments recovered from Bell's body during surgery.  (Tr. 65-66).  Crow placed the fragments in a specimen cup and gave them to a police officer.  (Tr. 66-67).

**Phillip Nardone**

As of May 4, 2003, Nardone was employed with the Lansing Police Department Crime Scene Investigation Unit.  (Trial Transcript, April 22, 2004, 75-77).  On that date, Nardone was dispatched to investigate the scene of Nicole Bell's shooting.  (Tr. 77-83).  Two days later, Nardone helped investigate Bell's vehicle after it had been recovered.  (Tr. 83-91).  Nardone also retrieved from the hospital, the bullet fragments recovered from Nicole Bell.  (Tr. 91-93).

**Sarah Thibault**

As of August 2003, Thibault was employed as a forensic scientist for the Michigan State Police. (Trial Transcript, April 22, 2004, 102-04, 112). That month, Thibault conducted DNA analysis on blood located on the shoes recovered from Petitioner when he was arrested. (Tr. 18-20, 112-14). The results of this analysis revealed the presence of genetic material from Nicole Bell and Petitioner. (Tr. 114-21).

Following the presentation of evidence, the jury found Petitioner guilty of assault with the intent to commit murder, possession of a firearm during the commission of a felony, and unlawful driving away of a motor vehicle. (Trial Transcript, April 23, 2004, 86-87). Petitioner received a sentence of 30-60 years in prison on the assault with the intent to commit murder conviction, a concurrent sentence of 40-60 months on the unlawful driving away of a motor vehicle conviction, and a consecutive sentence of two years for possession of a firearm during the commission of a felony. (Sentence Transcript, June 23, 2004, 16-17). Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

> I. Defendant was denied his state and federal constitutional right to a fair trial when the jurors discussed witnesses' testimony and shared outside information concerning the Defendant during the course of the trial.
>
> II. Defendant's conviction must be reversed because the trial court erred reversibly and violated Defendant's constitutional right to a trial by a fair and impartial jury when the court excused for cause a juror who only indicated she had biases but would follow the instructions of the court.

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Middlebrook*, 2006 WL 2000110 (Mich. Ct. App., July 18, 2006). Raising the same two claims,

Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal. The court denied

Petitioner's request, stating that "we are not persuaded that the questions presented should be

reviewed by this Court." *People v. Middlebrook,* 725 N.W.2d 31 (Mich., Dec. 28, 2006). On

December 12, 2007, Petitioner initiated the present action, asserting the following claims:

> I. Mr. Middlebrook was denied his state and federal constitutional right to a fair trial when the jurors discussed testimony and shared outside information concerning Mr. Middlebrook during the course of the trial.

> II. The trial court erred and violated Mr. Middlebrook's constitutional right to a fair and impartial jury when it excused for cause a juror who only indicated she had biases but would follow the instructions of the court.

Petitioner subsequently amended his petition to additionally assert the following

claims:

> III. Mr. Middlebrook was denied his Sixth and Fourteenth Amendment rights to the effective assistance of trial and appellate counsel.

> IV. Mr. Middlebrook was deprived of his right to due process under the 14th Amendment to the United States Constitution and under section 17, article I, Michigan Constitution 1963, where he is actually innocent of the crime and sentence he stands convicted.

**STANDARD OF REVIEW**

Middlebrook's petition is subject to the provisions of the Antiterrorism and Effective

Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the

substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court
        shall not be granted with respect to any claim that was
        adjudicated on the merits in State court proceedings unless
        the adjudication of the claim —

    (1)     resulted in a decision that was contrary to, or involved
            an unreasonable application of, clearly established
            Federal law, as determined by the Supreme Court of
            the United States, or

    (2)     resulted in a decision that was based on an
            unreasonable determination of the facts in light of the
            evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's

jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.  **Juror Conduct**  (Habeas Claim I)

Petitioner asserts that his right to a fair trial was violated as a result of juror misconduct. Specifically, Petitioner asserts that the jury, in assessing his guilt, improperly considered extraneous information that was not properly presented during the course of his trial.

After the presentation of evidence, but before closing arguments, juror James Logan wrote a letter to the court in which he stated that he had "a very deep concern for the actions of my fellow jurors." (Trial Transcript, April 23, 2004, 3-4). Logan indicated that jurors "have been

talking a lot about a television program that deals with forensics" and "they are making remarks regarding some witnesses." (Tr. 3-4). After sharing the contents of this letter with the prosecutor and defense counsel, the trial judge questioned juror Logan about the matter. When asked whether jurors had been "discussing the evidence," Logan responded, "not so much discussing the evidence as making remarks about certain witnesses." (Tr. 7). When asked to elaborate on the matter, Logan indicated that a juror had commented about Kelvin McCray that "his manner and something to the effect that quite a reliable witness he would make to such and things." (Tr. 7-8). Juror Logan further stated that:

> One of the remarks that bothered me a lot was [Petitioner] had quite a family, I suppose, I don't know on his side Thursday and one of them was - one of the jurors had made mention that her parents told her to watch her back when she leaves the courtroom. . .she made that remark and then the others joined in with a - to the effect of I wonder if they have a back door that we can go out, you know.

(Tr. 9-10).

> When questioned further about this topic, Juror Logan stated:
>
> She says, yeah, my parents told me to watch my back when I leave the courtroom. And then the others added to that, you know, something about do they have a back door we can get out, and then something about guns - guns was mentioned, you know, as they go out the back door and so and so on. . .I don't think they were serious. I think they were on a road they shouldn't have been on.

(Tr. 11).

The judge then questioned juror Jackson-Smith, the juror that allegedly made the comments referred to above. When asked whether she had discussed the case with her parents, Jackson-Smith stated:

> No, not at all. I was saying I was a juror, and that was just like the big joke of the thing. I never said anything about the case.

13

(Tr. 12-13).

When asked about the allegation that she had made a comment to "watch your back," Jackson-Smith responded:

> That was definitely incorrect. It was a joke from my family members. They were like you must have filled out the form, you know, and we were just talking about how we were trying to avoid having interaction with anybody. . .I never discussed the case with anybody. If anybody asked me about the case, I would tell them I can't do it until it's over.

(Tr. 13).

With respect to juror Logan's comment that jurors had been talking about forensics, Jackson-Smith reported that she was commenting about a video of the crime scene that the prosecutor had presented the previous day. (Tr. 13-14). Jackson-Smith also reiterated that her "watch your back" comment was "a joke. . .about how to avoid everybody." (Tr. 15). In this respect, Jackson-Smith reported that jurors:

> We were concerned because we're always coming in contact with people that's been in the case. Like this morning, when I got on the elevator, there were a couple of people that has testified and stuff on the elevator. I wasn't paying any attention. Then all of a sudden I heard somebody say, are you testifying today? And I looked over and saw who it was and I walked right off the elevator. . .Well, we were talking stuff like that and how we have to maneuver and come in contact - so that's basically it.

(Tr. 15-16).

The judge then briefly questioned juror Rojas, who responded that jurors had not been discussing the evidence or the credibility of the witnesses. (Tr. 19-21). After these jurors were questioned, Petitioner moved for a mistrial. (Tr. 22). The judge denied this motion stating, "I don't think there is any manifest necessity at this point." (Tr. 22). The parties then agreed to dismiss juror

Logan, after which the trial continued.  (Tr. 22).

Every criminal defendant enjoys the right to be tried by a "fair and impartial jury that considers only the evidence presented at trial."  *Fletcher v. McKee*, 355 Fed. Appx. 935, 939 (6th Cir., Dec. 11, 2009) (citation omitted).  As the Sixth Circuit has observed, "[c]learly established Supreme Court precedent dictates that '[w]hen a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury.'"  *Williams v. Bagley*, 380 F.3d 932, 945 (6th Cir. 2004) (citations omitted).

Upon receiving juror Logan's letter, the trial judge investigated the matter and determined that the jury had neither considered extraneous information nor engaged in any other misconduct.  Thus, the judge determined that Petitioner's constitutional rights were not threatened. The Michigan Court of Appeals rejected Petitioner's claim, observing that:

> In this case, the court received a letter from one of the jurors indicating problems in the jury room.  A recorded interview with the juror indicated that the other jurors had discussed the credibility of one of the witnesses before deliberations.  The juror also indicated that the "colored" juror told other jurors that her family told her to "watch her back," and she also allegedly noted that defendant had "quite a family."  The complaining juror admitted that the "watch her back" comment was a joke.  The court brought two other jurors into chambers separately for questioning, including the allegedly problematic juror.  They explained that they had not discussed the case with anyone, including family members or other jurors.  The accused juror explained that her comment was directed at the court's instruction that the jury avoid contact with anyone who might be involved in the case, and that the comments from her family were meant entirely in jest and related to her jury duty, generally, not to the case.  The complaining juror was excused by consent of the parties and the court.  Under the circumstances, defendant presented no evidence, beyond the bare allegation, that any of the jurors

discussed the credibility of any witness prior to jury deliberations or that the jury was exposed to extraneous information. Because defendant failed to demonstrate that the jurors engaged in any meaningful misconduct or tainted their deliberations with any extraneous influences, the trial court did not abuse its discretion in denying defendant's request for a mistrial.

*Middlebrook*, 2006 WL 2000110 at *1.

The decision by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.


**II.**  **Jury Composition**  (Habeas Claim II)

During the jury voir dire process, the following exchange occurred between Petitioner's counsel and a potential juror:

| | |
|---|---|
| Mr. Kamar: | Thank you. Now, Ms. Hall, you work for the state appellate - - |
| Juror Hall: | I did for six years. I've been at the criminal defense attorneys for the past year. |
| Mr. Kamar: | Okay. And what is your function there? |
| Juror Hall: | As the executive director? |
| Mr. Kamar: | Yes. |
| Juror Hall: | It's a membership organization, it's non-profit, serving the members. |
| Mr. Kamar: | Do you provide literature and information? |
| Juror Hall: | Frequently people will call me for information on briefs, sentencings, things like that, and I try to point them in the right direction. |
| Mr. Kamar: | The, obviously, as a paralegal, you actually research the law, I'm |

|  |  |
|---|---|
|  | sure. |
| Juror Hall: | I've been a paralegal since 1988, and I was in the - - always on the criminal side, but civil and then criminal. |
| Mr. Kamar: | Could you put, and I know this is hard, your experiences and researching the law and what you think the law may be aside after you hear the instructions from the Court? |
| Juror Hall: | I would like to believe I would follow - - of course I would follow the instructions, but if I'm going to be completely honest, I have a lot of biases.  And I'm not - - I'm not sure that I could - - I mean, to be perfectly honest, I'm just not sure. |
| Mr. Kamar: | Fair enough. |

(Trial Transcript, April 19, 2004, 59-60).

   The prosecuting attorney subsequently challenged juror Hall for cause on the ground that "[s]he showed a state of mind that she could not be fair and impartial." (Tr. 82-83).  Petitioner's counsel objected, stating that "I believe she answered that she could be fair and impartial." (Tr. 83).  The trial judge granted the prosecutor's motion and excused Hall for cause.  (Tr. 83).  Petitioner asserts that his conviction must be reversed because his right to a trial by a fair and impartial jury was violated by the dismissal of juror Hall.

   The Sixth Amendment commands that every criminal defendant "shall enjoy the right to a speedy and public trial, by an impartial jury."  U.S. Const. amend. VI.  In addition to the safeguards articulated in the Sixth Amendment, the Constitution's due process protections likewise afford to criminal defendants the right to be tried by an impartial jury.  *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)).  As is recognized, the voir dire process is designed to protect this right "by exposing possible biases, both known and unknown, on the part of potential jurors."  *Mitchell*, 354 F.3d at 520 (quoting *McDonough Power*

*Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

When the ability of a juror to serve impartially is at issue, "the relevant question is 'did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.'" *Mitchell*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). In the context of a petition for writ of habeas corpus, a trial court's assessment regarding a juror's ability to serve impartially is a factual finding "entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence." *Mitchell*, 354 F.3d at 520 (citing 28 U.S.C. § 2254); *Greene v. Georgia*, 519 U.S. 145, 146 (1996) (per curiam) ("under 28 U.S.C. § 2254(d), federal courts must accord a presumption of correctness to state courts' findings of juror bias").

As the exchange quoted above reveals, juror Hall did not assert that she could set aside her numerous biases, but instead stated that she was "not sure" if she could do so. The trial judge, therefore, determined that Hall was disqualified from service. The determination that Hall was not sufficiently impartial to serve as a juror is a factual finding that Petitioner can overcome "only upon a showing of clear and convincing evidence" to the contrary. Petitioner has made no such showing. The Michigan Court of Appeals rejected Petitioner's claim, finding as follows:

> In this case, defendant contends the potential juror explained that while she had biases toward the defense, she could put those biases aside. However, the potential juror clearly acknowledged that, as a result of her employment, she had biases in favor of the defense. She asserted that she was not certain that she could set those biases aside and decide the case based solely upon the evidence presented in court. Although she initially said she would follow the court's instructions, she modified her answer and noted that she was not sure she could put her experience aside and follow the court's instructions. "This Court defers to the trial court's superior ability to assess from

a venireman's demeanor whether the person would be impartial." The court did not abuse its discretion by excusing the potential juror for cause.

*Middlebrook*, 2006 WL 2000110 at *1 (internal citation omitted).

The decision by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.        Ineffective Assistance of Counsel** (Habeas Claim III)

Petitioner asserts numerous claims that he was denied the right to the effective assistance of both trial and appellate counsel, each of which is discussed below. Petitioner has failed to properly exhaust these claims in the state courts. The Court notes, however, that these claims can be denied on the merits, Petitioner's failure to properly exhaust notwithstanding. *See* 28 U.S.C. § 2254(b)(2).

To demonstrate that he was deprived of the right to the effective assistance of counsel, Petitioner must first establish that his attorney's performance was deficient in that it "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). In assessing whether counsel's performance was deficient, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. Moreover, judicial scrutiny of attorney

performance, however, is "highly deferential." *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (citing *Strickland*, 466 U.S. at 689).

Petitioner must further establish that he was prejudiced by his attorney's deficient performance. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (citing *Strickland*, 466 U.S. at 687-88). To establish prejudice, Petitioner must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 694). However, an examination of prejudice "must not focus solely on mere outcome determination; attention must be given to 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Combs*, 205 F.3d at 278 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

### A.      Failure to Call Alibi Witnesses

Petitioner first asserts that his trial attorney improperly failed to question at trial several alleged alibi witnesses. According to Petitioner, these individuals would have testified that he was not with Nicole Bell the night she was shot. Even if the Court assumes that counsel's failure to question these individuals constituted deficient performance, Petitioner has failed to demonstrate that he was prejudiced thereby. While Petitioner speculates that the individuals in question would have testified that he was elsewhere during the time in question, he has presented no *evidence* in support thereof. Habeas relief cannot be granted on the basis of such unsupported speculation.

B.       Failure to Subpoena Telephone Records

Petitioner next faults his attorney for failing to subpoena telephone records that allegedly would have supported his alleged alibi defense.  Again, even if the Court assumes that counsel's performance was deficient, Petitioner has failed to demonstrate that he was prejudiced thereby.  While Petitioner speculates that the records in question would have supported his defense, he has presented no *evidence* that such is the case.  Habeas relief cannot be granted on the basis of such unsupported speculation.

C.       Jury Decisions

Petitioner asserts that during jury selection he informed his trial counsel that he "occasionally had sexual relations" with one of the jurors.  Petitioner asserts that he instructed his attorney to excuse this individual, but that his attorney failed to do so.  As noted above, the Court must "indulge a strong presumption" that counsel's decisions regarding jury selection constituted sound trial strategy.  Petitioner offers no evidence that his attorney's decision not to challenge the juror in question was deficient or that he was prejudiced thereby.  Accordingly, this claim raises no issue on which habeas relief may be granted.

Petitioner also faults his attorney for agreeing to excuse juror James Logan who, as discussed above, wrote a letter to the court indicating that he had "a very deep concern for the actions of my fellow jurors."  Again, Petitioner offers no evidence to overcome the presumption that counsel's decision in this regard was sound trial strategy.  Petitioner likewise has failed to demonstrate that he was prejudiced by counsel's actions.  Accordingly, this claim raises no issue on which habeas relief may be granted.

D.      Expert Witnesses

Petitioner asserts that his trial attorney rendered ineffective assistance by failing to call as witnesses experts in the fields of handwriting analysis, DNA, and fingerprint analysis. Even if the Court assumes that counsel's failure in this regard was deficient, Petitioner has failed to establish that he was prejudiced thereby. Petitioner offers nothing more than speculation as to the testimony such witnesses would have offered. Habeas relief cannot be granted on the basis of such unsupported speculation.

E.      Appellate Counsel

Finally, Petitioner faults his appellate counsel for failing to assert on appeal the various claims discussed immediately above. Because Petitioner has failed to demonstrate that any of the claims in question have merit, he cannot establish that he was prejudiced by his attorney's alleged shortcoming. Accordingly, this claim is without merit.

**IV.**          **Actual Innocence**  (Habeas Claim IV)

          Petitioner asserts that he is entitled to habeas relief because he is actually innocent of the crimes of which he was convicted.  Petitioner did not pursue this claim in the state courts.  As previously noted, however, this claim can be denied on the merits, Petitioner's failure to properly exhaust notwithstanding.  *See* 28 U.S.C. § 2254(b)(2).

          In *Herrera v. Collins*, 506 U.S. 390 (1993), the Court observed that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400, *see also*, *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) ("The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief but, rather, that the newly discovered evidence can only be reviewed as it relates to an 'independent constitutional violation occurring in the underlying state criminal proceeding.'") (citations omitted).  As the *Herrera* Court stated, "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact." *Herrera*, 506 U.S. at 400.

          As discussed herein, Petitioner has failed to identify any error of federal or constitutional law that occurred during his trial or that has resulted from his conviction and imprisonment.  Accordingly, this particular claim is not cognizable and affords Petitioner no relief.  Furthermore, even if the Court could consider Petitioner's claim of actual innocence, such fails as Petitioner has presented absolutely no evidence even suggesting that he has been wrongfully convicted.  Accordingly, this particular claim affords Petitioner no relief.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Middlebrook's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: June 22, 2010                           /s/ Ellen S. Carmody
                                              ELLEN S. CARMODY
                                              United States Magistrate Judge